IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
*Newport News Division*

UNITED STATES OF AMERICA

   v.               Case No. 4:21-cr-24

D'CARLO NIMIS DELUCA,

   **Defendant.**

**POSITION OF DEFENDANT WITH RESPECT TO SENTENCING FACTORS**

COMES NOW the Defendant, D'Carlo Nimis Deluca ("Mr. Deluca"), by counsel, pursuant to Section 6A1.2 of the *Sentencing Guidelines and Policy Statements*, and this Court's Sentencing Order, and submits his position with respect to the sentencing factors. Mr. Deluca has no objections to the Pre-Sentence Report ("PSR").

**The Sentence Requested**

Mr. Deluca is before this Court for sentencing after entering a plea of guilty, pursuant to a written agreement, to False Information and Hoax, in violation of 18 U.S.C. 1038(a)(1). Sentencing is scheduled for February 4, 2022. With a total offense level of 15 and Criminal History Category V, the advisory guideline range is 37-46 months. Mr. Deluca submits that a downward variance is warranted in this case because the guidelines fail to account for his diminished capacity and mental health challenges.

Mr. Deluca respectfully submits that a sentence not to exceed 16 months, followed by a term of supervised release is appropriate. The requested sentence would not create unwarranted sentencing disparity when compared to other similar cases in this District. Moreover, the requested sentence complies with the mandate to impose a sentence

1

"sufficient, but not greater than necessary" to achieve the purposes of sentencing as set forth in 18 U.S.C. § 3553(a)(2).

Mr. Deluca has consistently accepted responsibility for his actions, never attempting to shift the blame on others. His response was to come clean, admit his guilt, and do everything that he could to make things right or in some way reverse the harmful effects of his wrongdoing. He deeply regrets his involvement in this offense and those who have been harmed by his actions.

### Mr. Deluca's Personal History and Characteristics

D'Carlo Nimis Deluca was born Robert Clark in 1970 and grew up in California. His mother was only sixteen when he was born, and her life remained unstable for many years following his birth. His parents separated when he was six years old, and from six to twelve Mr. Deluca stayed with his mother. It was during that time that he was sexually abused by the deacon of his church; the man demanded oral sex after Sunday services and threatened Mr. Deluca not to tell anyone. To make matters worse, he was constantly bullied at school for his mixed-race parentage: his father was a black mechanical engineer from an educated family, his mother a white, Italian American from a less well-educated family. At home he faced instability in his mother's household.

At age twelve, Mr. Deluca went to live with his father, who provided a more stable home environment and motivated his son to preserve in his schooling. Mr. Deluca graduated from Westchester High School in Los Angeles in 1988 and became the first person on his mother's side of the family to matriculate to college. He left in his final year

at the University of Houston in 1993 in order to take work full time at NASA contractor Northrop Grumman.

Over the next 10–12 years, from about 1993 to about 2004, Mr. Deluca lived, to outward appearances, a highly successful life. He held down a series of responsible and high-paying project manager jobs, at Northrop Grumman, then Health Partners, Net Perceptions, Concentra Managed Care, Keane Consulting, and Weill Cornell. His last several jobs paid an annual salary of $130,000–140,000. Despite the outward appearances, the fact is that Mr. Deluca had suffered a significant and lasting injury that began to manifest itself during these years. These injuries, or wounds, were the direct result of the two-year period of sexual abuse that he suffered as a six-year little boy.

Long-term effects of childhood sexual abuse are varied, complex, and often devastating. Depression, anxiety, and anger are the most commonly reported emotional responses to childhood sexual abuse. However, there is a myriad of different effects that childhood sexual abuse has on adult survivors later in their lives. These changes include both physical and emotional changes.[1] Mental health problems caused by childhood sexual abuse include personality disorders, complex post-traumatic stress disorder, depression, anxiety disorders, dissociative disorders, and psychosis. Substance abuse has also been identified as a huge consequence of surviving child sexual abuse. Many survivors use alcohol or drugs to bury their emotions so that they do not need to remember or face what happened to them in childhood. [2] Moreover, sexual disturbances

---

[1] https://cptsdfoundation.org/2021/04/19/the-long-term-harmful-effects-of-childhood-sexual-abuse/
[2] Id.

are common as well with many survivors swinging in one direction or the other from disinterest and loathing of sex to promiscuity.

As Mr. Deluca's life progressed, it is clear that he experienced many of the aforementioned issues as a result of the abuse he suffered as a little boy. The long-term effects began to manifest themselves in his personal life. After college he was in a common-law marriage recognized by the State of Texas with Lynnda Wright. They had two children together, Yhane and Niccolo. Yhane has Down Syndrome; Mr. Deluca became depressed and received psychiatric treatment for major depressive disorder. In counseling, Mr. Deluca began to discuss and come to terms with his sexuality. He came out first as bisexual and later as gay. Mr. Deluca and Lynnda got divorced, and he began having relationships with men.

His life took a drastic turn for the worst in his 30s. He began abusing drugs and sustained his first arrest, for drug distribution, at age 35. In 2008, at age 38, Mr. Deluca was diagnosed with HIV. He also has GERD and an essential tremor; during the pendency of this case, he was diagnosed with early-stage anal cancer. Sadly, he also decompensated psychologically. After returning to California in 2015, to care for his mother who had been diagnosed with cancer, he began suffering from manic, psychotic, and delusional episodes.

He returned to New York in early 2019, and his condition can best be described as unwell, unmoored, and not under the care of a psychiatrist. His parents had both just died—his mother in late 2018, his father in early 2019—and he was psychotic and unmedicated. It was in this state that he made the 911 calls alleged in that led to his arrest

and conviction in the Southern District of New York. Just prior to his arrest, he involuntarily committed to the psychiatry ward at one the Mt. Sinai – North Central Bronx Hospital. He was discharged a month later and arrested.

On September 16, 2020, he appeared in court and was sentenced to five months incarceration followed by a 1year term of supervised release. On or about October 9, 2020, the time of his release from custody, he was immediately to a residential inpatient mental health and substance abuse treatment program for a sixty (60) day period. He began his term of supervised release on October 9, 2020 and started treatment at The Community Counseling and Mediation in Brooklyn, New York. He bounced around from one place to the other until his placement into the Samaritan Daytop Program for mental health treatment. [3] He reported to the program on November 19, 2020 and was successfully discharged from the program on January 19, 2021. However, in the month prior to his admission and the days following his release form the program, Mr. Deluca continued to exhibit psychosis as he sent numerous text messages to various individuals. On October 21, 2020, the defendant sent 55 text messages to his probation officer that included thoughts about illegal gang activity and inappropriate pictures of various men and male genitalia. (PSR ¶31)

On January 20, 2021, the day after his release, Mr. Deluca began texting his probation officer again with gang activity, other illegal activity and messages concerning his sexual orientation. On January 25, 2021, he expressed interest in returning to inpatient

---

[3] http://www.samaritanvillage.org/people-we-serve/people-with-addictions/intensive-residential-treatment

treatment after he noted he was having difficulties adjusting to his environment. He continued to send incoherent rambling text messages to his probation officer that again included thoughts about gang activity or other illegal activity and texts about his sexual orientation.

On February 12, 2021, Mr. Deluca called 9-1-1, and reported that an individual was going to kill President Biden. The next day, he called 9-1-1 in New York again. He advised that he wanted to contact the Fresno Police Department because he had outstanding warrants and wanted to make a complaint to their Internal Affairs division. A short time later, he called 9-1-1 again and asked for the same phone number to the Fresno Police Department. They told him that they already gave him that number and the defendant responded, "Yea but I didn't tell them I wanted to kill the President." On February 16, 2021, he called 9-1-1 again and made additional threats to President Biden. Police officers responded to the defendant's residence and he claimed there was a bag in his building that may have a bomb in it and that President Biden was in the building. He was transported to Mount Sinai Hospital for a psychiatric evaluation and he was immediately discharged. (PSR ¶31).

On February 22, 2021, he called Langley Air Force Base, which led to his arrest on the charges herein. His probation officer was concerned about his mental state and contacted a mobile crisis counselor. On February 24, 2021, the defendant was admitted to Gracie Square Hospital. On March 3, 2021, the defendant was discharged from the hospital and referred to Bowery Residents' Committee's, Fred Cooper Substance Abuse Services Center for intensive outpatient treatment.

On April 6, 2021, he attempted to enter the U.S. Courthouse in New York to meet with his probation officer. However, he had brought with him a small quantity of methamphetamine with him. Mr. Deluca brought it to show his probation officer that there was criminal activity occurring in his neighborhood. He was taken into custody and has been held since that time.

## Downward Departure/Variance

Mr. Deluca's history, characteristics, and the nature and circumstances of the offense warrant a downward departure for diminished capacity pursuant to U.S.S.G. § 5K2.13, and pursuant to Section § 5H1.3. As noted in the PSR, Mr. Deluca has a lengthy and documented history of mental illness. In January 2020, he was evaluated by Dr. Jessica Pearson, Psy. D. in relation to a previous series of offense that nearly identical to the fact herein. Dr. Jessica Pearson, found in her appended forensic psychological assessment of Mr. Deluca that he "meets criteria for the following DSM-5 disorders: Bipolar I Disorder, most recent episode manic with psychotic features; PTSD, by history; Borderline Personality Disorder, by history; Attention Deficit Hyperactivity Disorder, by history; Cocaine Use Disorder and Alcohol Use Disorder." The PSR details Mr. Deluca's extensive and lengthy history of mental illness, including the time of his arrest.

1. **Diminished Capacity**

"In order to establish a diminished capacity departure, a defendant has the burden to establish two things: (1) that he committed the offense while suffering from a significantly reduced mental capacity and (2) that this significantly reduced mental capacity contributed substantially to the commission of the offense. USSG § 5K2.12.

7

"Significantly reduced mental capacity" means the defendant, although convicted, has a significantly impaired ability to: (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrong. USSG § 5K2.13 n. 1. The facts herein clearly demonstrate that Mr. Deluca meets the criteria for diminished capacity.

The facts herein clearly demonstrate that Mr. Deluca was suffering from a diminished capacity at the time of the offense. First, the facts demonstrated that he committed the offense while suffering from a significantly reduced mental capacity. The calls made to Langley were part of a series of bizarre calls and text messages that he began sending following his release from the Samaritan Daytop Program. He has struggled with mental illness for many years, and he has been hospitalized on numerous occasions as a result. In addition, the facts surrounding the offense, the available medical history, demonstrate that his significantly reduced mental capacity contributed substantially to the commission of the offense.

Sentencing courts have granted significant downward departures when a defendant's mental condition substantially contributed to the offense. *See e.g., United States v. Boutot,* 480 F.Supp.2d 413 (D. Mass. 2007) (departing downward to a sentence of two weeks of incarceration based on defendant's schizophrenia); *United States v. Shore,* 143 F. Supp. 2d 74, 80 (D. Mass. 2001) (departing downward to a sentence of two years' probation with four months home confinement in tax prosecution based on defendant's major depressive disorder and post-traumatic stress syndrome); *United States v. Ribot,* 97 F. Supp. 2d 74, 82 (D. Mass. 1999) (departing downward to a sentence of three years'

8

probation with six months home confinement in prosecution for income tax evasion and embezzlement based on defendant's major depressive disorder); *United States v. Herbert*, 902 F. Supp. 827, 829-830 (N.D. Ill. 1995) (departing downward to a sentence of forty-two months' probation with six months home confinement in embezzlement and tax fraud case based on defendant's longstanding mental depressive/personality illness).

A departure under Section 5K2.13 is appropriate even when a defendant's mental illness does not impair his ability to understand the wrongfulness of his actions. For example, in *United States v. Liu*, 267 F.Supp.2d 371 (E.D.N.Y. 2003), the Court granted a four-point downward departure based on the defendant's diagnosis of gambling addiction. In that case the defendant did not argue that he was unaware that the fraud he committed was wrongful. Instead, he demonstrated that his mental illness "impaired his ability to control behavior that he knew was wrong." *Id.* at 374. The Court held that "either a cognitive or volitional impairment" may serve as the basis for a 5K2.13 departure. *Id.* at 375. "[S]ection 5K2.13 does not differentiate between instances in which the reduced mental capacity explains the behavior that constituted the crime or motivated the crime." *Id.* at 375. The focus is simply on whether the reduced mental capacity was a "contributing" cause of the offense. While *Lui* is pre-Booker, it reflects the recognition that sometimes, mental capacity falls into a "grey area," not always rising to a level that would negate an inability to understand right from wrong.

As these cases instruct, the question for purposes of sentencing is not whether Mr. Deluca's mental illness prevented him from appreciating the wrongfulness of his conduct - it did not - but whether the mental illness was a contributing factor to that misconduct

9

- it surely was. His compliance with treatment and medications shows that, when considering the appropriate sentence, the need to protect the public – while very important – should not be elevated above Mr. Deluca's need for continuing mental health services.

In light of the foregoing evidence, Mr. Deluca qualifies for a downward departure based on his diminished capacity.

2. **Section § 5H1.3**

Section § 5H1.3 provides that "mental and emotional conditions may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines." The sentencing court should depart on the basis of mental or emotional conditions only if those conditions are "present to an exceptional degree or in some other way that makes the case different from the ordinary case where [those conditions] are present." *United States v. DeBeir*, 186 F.3d 561, 566 (4th Cir. 1999). A departure is appropriate only where the defendant's condition contributed to his or her commission of the offense, such that there exists a causal connection between the defendant's mental or emotional condition and the criminal conduct. *United States v. Reinoso*, 350 F.3d 51 (2d Cir. 2003); *see also United State v. Brady*, 417 F.3d 326 (2d Cir. 2005).

The facts herein also support a departure predicated on Section § 5H1.3. Mr. Deluca's mental and emotional condition, his lengthy history of mental illness, and intellectual disability, are clearly "present to an exceptional degree or in some other way

10

that makes the case different from the ordinary case where [those conditions] are present." Further, his condition contributed to the commission of the offense, such that there exists a causal connection between his criminal conduct and his mental and emotional condition.

In light of the foregoing evidence, Mr. Deluca qualifies for a downward departure based on his diminished capacity and Section § 5H1.3. Mr. Deluca respectfully submits that a sentence of time served, followed by a three-year term of supervised release is appropriate.

### The Kinds of Sentences/the Sentencing Range Established for the Offense/ and The Pertinent Policy Issued by the Sentencing Commission

This Court has both the discretion and the array of options necessary to ensure that Mr. Deluca's sentence is sufficient but not greater than necessary to comply with the statutory sentencing factors. In fact, the Court must consider non-prison sentences. *United States v. Pyles*, 272 F. App'x 258, 261-62 (4th Cir. 2008) ("§ 3553(a)(3) directs the judge to consider sentences other than imprisonment"). Through a combination of probationary conditions, such as community service, continued counseling, monitoring of financial activity– and, if the Court sees fit, a period of home confinement – a just and appropriate sentence can be fashioned.

Mr. Deluca knows that he has pled guilty to a serious charge. He admitted his guilt and expressed remorse for his conduct. The Court's statutory directive is to consider not only the nature of the offense, but also the real-life circumstances. *See* 18 U.S.C. § 3553(a)(1). Title 18, United States Code, section 3661 provides: . . . "no limitation shall be

placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence," cited in *United States v. Booker*, 543 U.S. 220, 249-50 (2005). In *Koon v. United States*, 518 U.S. 81, 113 (1996), the Supreme Court said: '[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate . . . the crime and punishment to ensue."

Mr. Deluca submits that full consideration of the § 3553 factors in this case and consideration of the mitigating factors set forth supports his request for a not to exceed 16 months, followed by a term of supervised release.

## CONCLUSION

Mr. Deluca accepts full responsibility for his actions. These sentencing factors, cumulatively and appropriately, reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense. A sentence not to exceed 16 months, followed by a term of supervised release is sufficient to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for Mr. Deluca's conduct. Such a sentence avoids unwarranted sentence disparity, given Mr. Deluca's history and characteristics, and other sentencing factors, and serves the mandate of § 3553(a) to impose a sentence sufficient, but not greater than necessary to punish Mr. Deluca's conduct.

Respectfully submitted,

D'CARLO NIMIS DELUCA

By:_____/s/_____
   Rodolfo Cejas, II
   VSB No.: 27996
   Attorney for D'Carlo Nimis Deluca
   Office of the Federal Public Defender
   150 Boush Street, Suite 403
   Norfolk, Virginia 23510
   (757) 457-0885 (telephone)
   (757) 457-0880 (facsimile)
   Rodolfo_Cejas@fd.org


   _____/s/_____
   Christopher James O'Donnell
   Christopher J. O'Donnell, PLLC
   100 7th Street
   Suite 104
   Portsmouth, Virginia  23704
   Ph:757-544-8673
   Email: cjoattorney@gmail.com

**CERTIFICATE OF SERVICE**

    I HEREBY CERTIFY that on this 28th day of January, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel of record.

By:_____/s/_____
Rodolfo Cejas, II
VSB No.: 27996
Attorney for D'Carlo Nimis Deluca
Office of the Federal Public Defender
150 Boush Street, Suite 403
Norfolk, Virginia 23510
(757) 457-0885 (telephone)
(757) 457-0880 (facsimile)
Rodolfo_Cejas@fd.org